# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| MONTY BELL, | ) |
|---|---|
| Plaintiff, | ) |
| vs. | ) CIVIL ACTION NO. 09-0211-CG-C |
| J. RAY MCDERMOTT, INC., | ) |
| Defendant. | ) |

## ORDER

On April 16, 2009, Monty Bell brought a lawsuit against J. Ray McDermott, Inc. ("McDermott") claiming that "[t]he defendant unlawfully discriminated against the plaintiff in retaliation for his opposition to the defendant's unlawful employment practices, including his complaints of behavior which violated laws against sexual harassment." (Doc. 1, p. 5). This matter is now before the court on the defendant's motion for summary judgment (Doc. 22), the plaintiff's response (Doc. 28), and the defendant's reply. (Doc. 30). For the reasons stated below, the defendant's motion for summary judgment is due to be **GRANTED.**

## FACTS

The defendant hired the plaintiff on March 25, 2008, to work as a crane operator on an offshore barge/oil rig. (Doc. 23-1, Bell Dep., pp. 2-3). The plaintiff had previously worked for the defendant between 1980 and 1985 as a rigger, a tower operator, and a crane operator. At the end of that time, he was laid off by the defendant due to a lack of available work. (Doc. 29-4, Bell Dep., pp. 5-11). When the plaintiff was hired by the defendant in 2008, he interviewed with and was hired by the general superintendent, Willy Hall ("Hall"). (Id., p. 12). Upon being hired, the plaintiff was first assigned to barge DB 50, but was ultimately transferred to barge DB 16 in

the Gulf of Mexico. (Doc. 23-1, Bell Dep., p. 3). The plaintiff asserts that Hall told him he was being sent to barge DB 16 because "the other operator couldn't run the crane" and he thought the plaintiff could run it better. (Doc. 29-4, Bell Dep., pp. 18-19).

The plaintiff testified that from the first day he arrived on barge DB 16, he was sexually harassed by Michael Bergeron, a co-worker on the barge. (Doc. 29-4, Bell Dep., p. 25). The plaintiff testified that on May 5, 2008, he told his foreman, Ray Defelice, about the harassment and that Mr. Defelice told him to talk to Mr. Bergeron. (Id., p. 56 & 60). Also on that day, the plaintiff testified he told a safety man and several crew members about the harassment and that they told him to call the defendant's Ethics Hotline. (Id., pp. 56-61).

In the evening of May 5, 2008, the plaintiff was removed from working on the crane. (Doc, 29-4, Bell Dep., p. 34). The plaintiff testified that Mr. Bergeron came up to the crane and told him that "they" wanted him on the deck, but Mr. Bergeron did not tell him specifically who "they" were but the plaintiff "reckoned" that it was Mr. Defelice. (Doc. 29-4, Bell Dep., pp. 30-31). Upon arriving at the deck, the plaintiff testified that he asked Mr. Defelice for instructions and that he told him "[t]hat we were working with whatever the part of the job we were doing" but that it was not his belief that the plaintiff had been permanently removed from operating the crane. (Doc. 29-4, Bell Dep., p. 32).

On the morning of May 6, 2008, the plaintiff testified that he woke up and went to a regular safety meeting that was conducted by Mr. Defelice. Before the meeting, the plaintiff asserts that he was again harassed by Mr. Bergeron and that, at that moment, he decided to call the Ethics Hotline. (Doc. 29-4, Bell Dep., p. 34-35). At 10:54 a.m. CST, the plaintiff placed a telephone call to the defendant's Ethics Hotline in North Carolina and told the operator that Mr.

Bergeron had been sexually harassing him. (Doc. 23-1, Bell Dep., pp. 7-9). Global Compliance, a company which is independent from the defendant, monitors the defendant's Ethics Hotline calls. (Doc. 23-1, Borne Dep., p. 14). Upon receiving the plaintiff's call, Global Compliance generated an e-mail. The body of this email did not contain any specific details of the plaintiff's allegation; rather, the details were contained in a separate attachment to the email. This email and attachment were then sent on May 6, 2008, to the defendant's Human Resource Manager, Linda Borne. (Doc. 23-1, Borne Dep., pp. 16-17; Doc. 23-1, Exhibit E, pp. 33-34). When the email was sent to Ms. Borne, she was attending an offshore technology conference ("OTC") in Houston, Texas, and though she could read the body of the email, she did not have the ability to open and look at the attachment. The first time she read the attachment was on May 8, 2006, when she returned to her office in Amelia, Louisiana. (Doc. 23-1, Borne Dep., p. 17, 20-22).

After he called the Ethics Hotline, the plaintiff attended the daily safety meeting where he observed that Defelice and Bergeron were called to the captain's office. (Doc. 29-4, Bell Dep., p. 40). Once the safety meeting concluded, the plaintiff testified that Mr. Bergeron approached him in the eating area and told him "I didn't mean to get you fired." (Id., p. 41-42). The plaintiff "just kind of blew it off" and after eating, went to the deck for work. Immediately upon arriving on the deck. Mr. Defelice approached him and told him to "turn around and go pack your bags, the helicopter's coming to get you." The plaintiff maintains that he was never told why he was terminated. (Id., pp. 42-43).

The plaintiff testified that he left the barge and arrived on shore late in the day on May 6, 2008. While he was driving home, the plaintiff maintains he called Mr. Hall on the phone and "asked him if I could be transferred to another position or another barge so I wouldn't have to

3

put up – when I mentioned it to him about the harassment charge, he mentioned Michael's name. I said, yes, sir, Mr. Bergeron." (Doc. 29-4, Bell Dep., p. 44-45). The plaintiff, thereafter, testified that Mr. Hall told him that "he'd get back with me" but the plaintiff did not hear from Mr. Hall on that day. (Id., p. 46).

While the above events were happening, Danny J. Harris, a safety tech on barge DB 16, at 11:38 am sent an email to Drake M. Trosclair, a human resources administrator, that stated:

> Monty Bell is a SSE crane operator that has demonstrated a lack of ability to safely operate our 203 crane. We have taken him off the deck as he is aware that he's departing the barge this afternoon. Ray Defelice, his current foreman, has seen no improvement in his ability as an operator over the past week and feels that if allowed to continue operating; Monty could hurt someone as he moves a load...
>
> I am attaching the completed evaluation form for your review... let me know if this is the proper form to accomplish termination if deemed appropriate by Willy Hall.
>
> (Doc. 23-1, p. 35).

At 3:35 p.m. that same day, Mr. Trosclair sent Ms. Borne, who was Mr. Trosclair's superior, the following email:

> Just got back to handle this one, but I always try to discuss these cases with you before moving forward. Take a look at the documentation. I am comfortable removing this employee from the Crane, which it has occurred. He is on his way in, but I am not sure if I am comfortable terminating. I did speak with Willy today about both termination and demotion to a rigger position. He would like to terminate. I told Willy to just send him home tonight when he gets off and we can call him in the morning. I did not want to move to [sic] fast. What are your thoughts? I am still waiting for more information from the barge, the 48 hour checklist, etc.
>
> (Id.)

Mr. Hall, who is the defendant's general superintendent, testified that he received a phone call on May 6, 2008, that the plaintiff had been removed from operating the crane on barge DB 16, but he did not remember who called him or the specifics of the call. (Doc. 23-1, p. 28). Also on May

4

6, 2008, Bobby LeBoeuf, a British Petroleum employee who was on the barge DB 16, notified the defendant that

> Over the past few days I have had concerns about the operation of the JRM DB 16 track train. On several occasions I witnessed JRM riggers struggle to control loads being lowered by the crane and themselves express concerns about the handling and operation. I feel that it is only a matter of time before someone becomes injured or some equipment will be damaged due to the operator's knowledge and experience operating the crane. I feel a more experience[d] operator would be in the best interest of the project to ensure safe operation. JRM has worked extensively over the years of providing all their workers with a safe environment and I would hate for that environment to be compromised over one workers [sic] action.
>
> (Doc. 23-1, p. 32).

Ms. Borne testified that the defendant received this statement prior to when the plaintiff "was actually terminated for unsatisfactory work performance." (Doc. 23-1, Borne Dep., p. 19).

On May 7, 2008, Ray Trainor, who was barge foreman of barge DB 50, sent an email to Mr. Hall which provided the following:

> The time in which I evaluated Monty Bell he seemed very nervous and it very much affected his judgement [sic] and his ability to operate the crane safely. The majority of the crew did not want to work under the crane with him operating because he never seemed comfortable. Obviously this is very detrimental because every time something heavy or awkward had to be lifted then myself or Mr. Merlin had to be called to make the lift. In short if the crew doesn't trust him then it hobbles any crane work that has to be completed and the other operators are not always available. Monty has also been a little head strong when it comes to communications on the radio as well. When corrected he seems easily irritated and that also shows up in his abilities to operate. It is my opinion that you can never operate any equipment when you are angry because others will be hurt or killed quickly through your own negligence.
>
> (Doc. 23-1, p. 36).

Mr. Hall thereafter forwarded that email to Mr. Trosclair with the following notation: "Fyi". (Id.). After receiving that email from Mr. Hall, Mr. Trosclair sent an email to Ms. Borne stating that

> I received some documentation from Ray Trainor, Foreman and the DB50 on Monty and he had some issues with Monty being a very headstrong individual that did not take orders very well. I also spoke to Ray Defelice today and asked him how he felt about Monty and if we should offer him the opportunity to work as a rigger and Ray stated the he had some issues with him taking orders while in the crane and was a know it all and had a rough attitude. I am leaning toward releasing this individual after speaking to Ray and getting some feedback from Trainor.
>
> How do you feel if we released him?
>
> (Id., p. 37).

Ms. Borne thereafter responded by email to Mr. Trosclair that "[t]hat is fine." (Id.).

The plaintiff was effectively terminated on May 8, 2008. (Doc. 23-1, p. 38). Mr. Hall testified that he made the decision to terminate the plaintiff based on "the lack of job performance" in that "he wasn't operating the crane to the satisfaction of the superintendent, supervisor...". Mr. Hall also testified that he did not know about the plaintiff's sexual harassment complaint to the Ethics Hotline until after he had already terminated the plaintiff for poor job performance. (Doc. 23-1, Hall Dep., pp. 30-31). The plaintiff testified that he called Mr. Hall on or around May 8, 2008, and that Mr. Hall told him that he has been terminated but did not give a reason why. After he found out he was terminated, the plaintiff called the Ethics Hotline to complain that he was terminated because he had called the Ethics Hotline previously. (Doc. 29-4, pp. 46-51). The official clearance form, which was signed by Mr. Hall and a human resources administrator on May 9, 2008, stated that he had an effective termination date of May 8, 2008, and that he was not eligible for rehire. The form stated the reason for the plaintiff's termination was that he was "unable to perform duties as crane operator." (Doc. 23-1, p. 38).

## LEGAL ANALYSIS

### I. Summary Judgment Standard

6

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank

& Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in [the non-moving party's] pleading; rather, its response .... must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

## II. Title VII

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's

prohibition against discrimination based on sex encompasses sexual harassment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc). Generally, sexual harassment comes in two forms: harassment that results in a tangible employment action and harassment from a hostile work environment. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 508 (11th Cir. 2000). In his complaint, the plaintiff relies on the former. (Doc. 1, p. 5).

A plaintiff may prove retaliation by relying on either direct, circumstantial, or statistical evidence. See Walker v. NationsBank of Fla. N.A., 53 F.3d 1548, 1555-1556 (11th Cir. 1995); see also Wright v. Southland Corp., 187 F.3d 1287, 1305 (11th Cir. 1999)("the same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the McDonnell Douglas presumption." (citation omitted)). Direct evidence is that which, "if believed, proves the existence of discriminatory motive 'without inference or presumption.'" Hamilton v. Montgomery County Bd. of Education, 122 F.Supp.2d 1273, 1279 (M.D.Ala. 2000)(quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)). As the District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlat[e] to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.
>
> Id.(quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D.Ala. 1998)(brackets in original).

This court finds that none of the evidence submitted by the plaintiff qualifies as direct

9

evidence of retaliation or proves without inference or presumption that the persons who made the employment decisions did so as a result of a retaliatory motive.

The plaintiff, however, may attempt to show retaliation based on circumstantial evidence through the application of the McDonnell Douglas burden-shifting analysis established by the Supreme Court. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas framework, a plaintiff must first raise an inference of retaliation by establishing a prima facie case. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). "A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)(citing Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)).

Assuming for the purposes of argument that the plaintiff could establish a prima facie case, the burden would then shift to the defendant, who must "proffer a legitimate, nondiscriminatory reason for the adverse employment action. The employer's burden is exceedingly light." Hamilton, 122 F.Supp.2d at 1280(quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)(internal quotations omitted)). If the defendant proffers a legitimate reason for the employment decision, the burden then shifts back to the plaintiff who must "then 'show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.'" McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008)(citation omitted). "At the pretext stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a

minimum, that the proffered reasons were not actually the motivation for the employer's decision." Miller v. Bed, Bath & Beyond, Inc., 185 F.Supp.2d 1253, 1270 (N.D.Ala. 2002)(citing Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). The plaintiff may do this "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." Id.(citation omitted). This is done by pointing to "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" McCann, 526 F.3d at 1375 (citation omitted).

However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." Chapman, 229 F.3d at 1030(quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). It is not appropriate for either the plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." Chapman, 229 F.3d at 1030. The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. Tex. Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**1. Prima Facie Case**

In its memorandum in support of its motion for summary judgment, the defendant asserts that it "is entitled to summary judgment because... Plaintiff cannot establish his prima facie case as the decision maker did not even know Plaintiff had complained [of] sexual harassment before the termination." (Doc. 23, p. 1). To establish a prima facie case of retaliation based on

11

circumstantial evidence, the plaintiff must show:

> (1) []he engaged in statutorily protected expression; (2) []he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.
>
> Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002)(citations omitted).

There is no question that the plaintiff's call to the Ethics Hotline is a statutorily protected expression. Furthermore, the complaint of sexual harassment to Mr. Hall during the May 6, 2008, phone conversation also constitutes a statutorily protected activity. See Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001)("Statutorily protected expression includes internal complaints of sexual harassment to superiors..."). In regards to the second element, the plaintiff suffered an "adverse employment action" when he was effectively terminated on May 8, 2008. The third element of the prima facie case of retaliation, however, is in dispute.

### a. The scope of the plaintiff's claims

A preliminary disagreement has arisen as to the proper scope of the plaintiff's claims. In its reply, the defendant argues that the plaintiff "asserted in his Complaint (the lawsuit filed in the captioned matter) that his call to the ethics hotline on May 6, 2008, was the protected activity" but "mentions no other acts that constitute the protected activity." The defendant points out, however, that "[i]n his Opposition to the Motion for Summary Judgment, Plaintiff cites to other parts of his deposition in which he testified that he told Mr. Hall of the alleged sexual harassment..." Thus, the defendant maintains there is an issue of "whether Plaintiff can leave unaddressed McDermott's defense that the decision-maker could not have known of the ethics hotline call and rely instead on so-called protected activity that Plaintiff did not mention in the

12

Complaint he filed in court." (Doc. 30, pp. 2-3).

Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to contain, in part, a "short and plain statement of the claim showing that the pleader is entitled to relief" and a "demand for the relief sought..." Fed.R.Civ.P. 8(a). The purpose of Rule 8(a)(2) "is to give the defendant fair notice of the claims against him without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery." "As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because []he did not set forth in the complaint a theory on which []he could recover, 'provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.'" Evans v. McDonald's Corp., 936 F.2d 1087, 1090-1091 (10th Cir. 1991)(citations omitted); see also Green Country Food Market, Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279 (10th Cir. 2004).

This court finds that the defendant had fair notice that the plaintiff's phone call to Mr. Hall on the May 6, 2008, could be a basis for his retaliation claim.[1] Although the details of the phone call were not divulged in the complaint, the plaintiff clearly mentions that he had a conversation with Mr. Hall and that in that conversation he asked to be transferred. (See Doc. 1, p. 4)("[u]pon reaching the shore he called Willy Hall, the man that hired him and asked to be put on another barge. Mr. Hall told plaintiff no, that he was terminated."). The reason for the requested transfer was further detailed by the plaintiff in his deposition which revealed that it

---

[1] The defendant also objects the plaintiff's reliance on the conversations he had with the other employees on the barge on May 5, 2010. This court finds that the defendant did not receive fair notice that these complaints could be a basis for the plaintiff's retaliation claim since they were not mentioned anywhere in the complaint.

13

was because of the alleged sexual harassment.[2] It is this court's estimation that the defendant simply misconstrued, to some extent, that the plaintiff's complaint limits the plaintiff's retaliation claim to a specific alleged protected activity. Although the main focus of the complaint centers around the plaintiff's call to the Ethics Hotline, the plaintiff does mention the phone conversation with Mr. Hall in his complaint, and the prayer for relief broadly states that "[t]he defendant unlawfully discriminated against the plaintiff in retaliation for his opposition to the defendant's unlawful employment practices, including his complaints of behavior which violated laws against sexual harassment, as set out above." (Doc. 1, pp. 4-5). In sum, this court finds that the plaintiff properly pled as the basis for his retaliation claim both his complaint to the Ethics Hotline and his phone call to Mr. Hall.

### b. Causal Connection

In its memorandum in support of his motion for summary judgment, the defendant contends that there was no causal connection between plaintiff's call to the Ethics Hotline and the plaintiff's discharge. (Doc. 23, p. 9). The Eleventh Circuit holds that "[t]o meet the causal link requirement, the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997)(internal quotation marks and citation omitted); see also Laosebikan v. Coca-Cola Co., 167 Fed. Appx. 758, 764 (11th Cir. 2006)("To establish the causal link requirement, the plaintiff merely has to prove that the protected activity and the negative employment action are not

---

[2] The defendant can not claim that it was unfairly surprised by this revelation since the deposition occurred on January 27, 2010, which was a month before the discovery deadline (see Doc. 11), two months before the defendant filed their motion for summary judgment, and approximately nine months before the start of the trial.

completely unrelated."). In general, "'[a] plaintiff satisfies this element if []he provides sufficient evidence' of knowledge of the protected expression and 'that there was a close temporal proximity between this awareness and the adverse... action.'" Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)(citation omitted).

On May 6, 2008, the plaintiff made a complaint of sexual harassment to the company's Ethics Hotline and called Mr. Hall asking for a transfer because of the alleged sexual harassment by a co-employee. Two days later, the plaintiff was effectively terminated. This court finds that the plaintiff has shown a sufficiently close temporal relationship between his protected activities and his discharge that a reasonable jury could conclude that the protected activity and the negative employment action are not completely unrelated. Compare Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999)(citation omitted)(9-month gap between protected activity and adverse employment action precluded reasonable inference of causation) with Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986)(that plaintiff was discharged only one month after filing complaint with EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation").

However, in Brungart v. BellSouth Telecomms., Inc., the Court of Appeals for the Eleventh Circuit explained that although "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection", "there is this exception" when "there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." 231 F.3d 791, 799 (11th Cir. 2000). The undisputed evidence shows that Mr. Hall did not become aware of the plaintiff's call

15

to the Ethics Hotline until after he was terminated. However, this court finds that the plaintiff's complaint to Mr. Hall himself on May 6, 2008, is a disputed issue of fact. As stated above, the plaintiff testified that he left the barge and arrived on shore late in the day on May 6, 2008. While he was driving home, the plaintiff testified that he called Mr. Hall on the phone and "asked him if I could be transferred to another position or another barge so I wouldn't have to put up – when I mentioned it to him about the harassment charge, he mentioned Michael's name. I said, yes, sir, Mr. Bergeron." (Doc. 29-4, Bell Dep., p. 44-45). The plaintiff thereafter asserted that Mr. Hall told him that "he'd get back with me" but the plaintiff did not hear from Mr. Hall on that day. (Id., p. 46). Mr. Hall did not deny that this conversation existed but instead testified that he did not "remember that" conversation. (Doc. 29-3, Hall Dep., pp. 21-22). Viewing the facts in a light most favorable to the non-movant, this court finds that a reasonable jury could conclude that the plaintiff satisfied the third element.

### 2. The defendant's legitimate non-discriminatory reason

Having found that a reasonable jury could conclude that the plaintiff has satisfied all the elements for a prima facie case of discrimination, the burden shifts to the defendant to proffer legitimate, nondiscriminatory reasons for its decision to terminate the plaintiff's employment. Burdine, 450 U.S. at 254(holding that the presumption that intentional discrimination occurred raised by the plaintiff's prima facie case may be rebutted by the employer's articulation of a legitimate, nondiscriminatory reason for its adverse employment action). The defendant asserts that the reason the plaintiff was discharged was because of his poor job performance. (Doc. 23, p. 14; see Doc. 23-1. p. 38(the official clearance form stated that the termination reason was "unable to perform duties as crane operator.")). This reason was not contradicted by any other

evidence. Therefore, the court finds that the defendant provided legitimate, nonretaliory reasons for the plaintiff's discharge.

### 3. Pretext

Since the defendant has satisfied its burden, the plaintiff now bears the burden of offering enough probative evidence so that a reasonable jury might conclude that defendant's reasons for termination were a pretext for the discrimination or retaliation. See Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001); Bogle v. Orange County Bd. of County Commissioners, 162 F.3d 653, 658 (11th Cir. 1998). In the summary judgment context, a court must conduct this inquiry by determining whether a jury "could reasonably infer discrimination if the facts presented [by the plaintiff] remained unrebutted." Jameson v. Arrow Co., 75 F.3d 1528, 1531 (11th Cir. 1996).

The plaintiff first attempts to show pretext by disputing "that he was poor performer" and argues that when he previously worked for the defendant, his performance was satisfactory and also that he was transferred from barge DB 50 to barge DB 16 because "Hall told him... [that] the other operator couldn't run the crane and he thought Bell could run it better." (Doc. 28, pp. 13-14). The only evidence the plaintiff provides for this proposition, however, is his own opinion, and the plaintiff's own evaluation and opinion are not a sufficient basis to establish pretext. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332-1333 (11th Cir. 1998); Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997).

Second, the plaintiff tries to demonstrate pretext by maintaining that the defendant "did not follow its policy regarding termination for poor performance" in that no verbal or written warnings were ever given to the plaintiff for his poor performance. (Doc. 28, pp. 14-15). This

court, however, does not find this argument persuasive. The defendant had a disciplinary policy that lists thirty-two separate disciplinary offenses and provides the penalties for those offenses. (See Doc. 29-1). While some of the offenses require verbal and written warnings, like a "violation of safety rules," there are some offenses that warrant immediate termination, like "violation of safety rule which affect the safety of other personnel." (Id., p. 4). Poor performance is not specifically listed as one of the thirty-two disciplinary offenses. Second, even if poor performance were listed, the policy is not binding on the defendant. The policy provides the following "note":

> This list does not address every possible situation that requires corrective action, but rather the most common situations which could occur. In an effort to be consistent in the administration of our progress discipline, the below grid indicates recommended actions for the situations stated. However, management discretion can be used when circumstances may warrant either less or more severe corrective action be taken.
>
> (Id., p. 2).

Contrary to the plaintiff's arguments otherwise, this court finds nothing in the policy that requires the defendant to provide any warning to the plaintiff prior to terminating him for poor performance.[3]

Third, the plaintiff asserts that there is pretext by arguing that the defendant "has not been consistent in it's [sic] reason for termination." This court again is not persuaded by the plaintiff's argument. As stated above, the official clearance form, which was signed by Mr. Hall

---

[3] In fact, when asked why the plaintiff may not have received written or verbal warnings before he was terminated, Ms. Borne testified that during her investigation, she determined that there was "cause" to terminate the plaintiff without needing to give written and verbal warnings based on the "additional documentation from Ray Trainer and then from the BP HSE Rep." (Doc. 29-5, Borne Dep., pp. 36-38). The plaintiff provided no evidence convincing this court that Ms. Borne's explanation should not be believed.

and a human resources administrator stated the reason for the plaintiff's termination was that he was "unable to perform duties as crane operator." (Doc. 23-1, p. 38). The plaintiff points to the defendant's answer to an interrogatory question which asked in part for the reason for the termination to which the defendant answered "Plaintiff was relieved from his assignment as crane operator because he was not operating the crane properly and/or safely. Plaintiff was next assigned the job of RIGGER, but he failed to report for duty. He was then discharged." This answer is not entirely inconsistent with the defendant's proffered reason since it states that the plaintiff failed to perform his duties as a crane operator. However, to the extent this answer mentions he was assigned to a different job and failed to report for duty, this court finds this "inconsistency" in the employer's proffered reason does not rise to the level that a reasonable factfinder could find the defendant's proferred reason unworthy of credence.

After a thorough review of the record, this court concludes that the defendant's motion for summary judgment is due to be granted. Although the plaintiff satisfied the elements of a retaliation claim, the defendant presented nondiscriminatory reasons for its actions. The meager evidence, or lack thereof, produced by the plaintiff in response would not permit a reasonable jury to "legitimately draw the inference" that the defendant's proffered nondiscriminatory reasons for its employment decisions were pretextual and that the real reasons behind their actions were retaliatory. No reasonable juror could have found that the defendant retaliated against the plaintiff because he called the Ethics Hotline or Mr. Hall.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is **ORDERED** that the defendant's motion for summary judgment (Doc. 22) is **GRANTED**.

19

**DONE and ORDERED** this 2nd day of June, 2010.

                                          /s/ Callie V. S. Granade
                                          UNITED STATES DISTRICT JUDGE